UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 CR 0099 |
| | ) | |
| v. | ) | Hon. Joan B. Gottschall |
| | ) | |
| JACOB SELL | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

During an April 4, 2002 search of defendant Jacob Sell's home after his arrest for marijuana possession, Illinois state police officers discovered images of alleged child pornography on Sell's home computer. In March 2004, Sell filed a motion to suppress evidence obtained during the search of his residence and computer, and also moved pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) for an evidentiary hearing to clarify what Sell characterized as inaccuracies in the police's affidavit supporting the application for a search warrant for Sell's computer. On April 15, 2004, this court granted Sell's motion for a *Franks* hearing, which was held (after several discovery-related delays) on March 14, 2005. After the *Franks* hearing, Sell filed his supplemental motion to suppress pursuant to the Fourth Amendment and Rules 12(b)(3) and 41(f) of the Fed. R. Crim. P., seeking to suppress all evidence seized during the April 4, 2002 search. Because the briefing on Sell's supplemental motion takes account of the more complete factual record before the court as a result of the *Franks* hearing, the court focuses primarily on the arguments made therein. For the reasons discussed below, Sell's supplemental motion to suppress is granted.

1

**Facts**

At approximately 4:00 p.m. on April 4, 2002, Illinois State Police Sergeant William Heinrich and Inspector Jason Clift arrived at Sell's home in Streator, Illinois to execute an arrest warrant for Sell for the Illinois class 4 felony of unlawful possession of cannabis. Heinrich and Clift knocked on Sell's door, and when Sell opened it, they explained that they had a warrant for his arrest. What happened next is contested: the government says that Sell stepped backwards into his house, where Heinrich and Clift followed him to place Sell under arrest. Sell says that he stepped out onto his front porch to surrender, whereupon the officers pushed past him into his living room.[1] In any event, Sell was placed under arrest, and Heinrich and Clift ended up in Sell's front room where Heinrich saw what he believed to be cannabis on top of Sell's computer tower, located on a desk in the southeast corner of the house. Immediately after the arrest, Clift conducted an initial "quick walk-through of the house" to check for other people. At this point, neither Heinrich nor Clift saw anything to suggest that Sell might have child pornography in the house.

Heinrich then asked Sell for consent to search the house and Sell refused. Heinrich left the house to confer with Clift and other officers who were parked nearby but who were not yet actively participating in Sell's arrest. After this conference, Heinrich reentered Sell's house with Clift and three other police officers, Inspectors James Girton, Dennis Hocking and James Reed. Heinrich then called Assistant State's Attorney Brian Towne, described the suspected cannabis and other drug

---

[1] Sell says in his supplemental motion that he "does not abandon his previously argued claim that the officers exceeded their authority when they entered his home in order to execute the arrest warrant." Because Sell's motion is granted on other grounds, the court does not reach this argument.

2

paraphernalia that Heinrich had seen upon his first entrance into Sell's home, and asked Towne to obtain a search warrant. Sell was present while Heinrich was explaining to Towne the basis for his request for a search warrant. During this call, but before Towne had agreed to obtain the search warrant, Sell interrupted to consent to a search of the house. Sell signed a consent-to-search form provided by Heinrich at 4:25 p.m. This form indicates that Sell consented to a search of the "[h]ouse located at: 108 W. Broadway, Streator, Illinois," without further elaboration

Near the beginning of the ensuing search (conducted by Heinrich, Clift, Girton, Reed and Hocking), at 4:29 p.m., Heinrich photographed the area in which he had seen the suspected cannabis. This photograph shows the suspected cannabis located on top of the computer tower, and includes an image of Sell's computer monitor at that time, which was displaying a standard screen saver. Sell's computer was programmed to display this screen saver after eight minutes of inactivity.

After this, Heinrich was approached by Hocking who told him that there was an image of suspected child pornography on Sell's computer monitor.[2] Heinrich went to view the computer, and between 4:29 p.m. and 5:26 p.m., one of the officers inspected saved images on Sell's computer and also visited a website (the last one visited before Sell's arrest) called "magic-lolita.com members' area."[3] At approximately the same time as this computer inspection was taking place, Clift showed Heinrich several photographs of Sell's infant daughter, both partially dressed and naked. The court

---

[2] The court notes that earlier in these proceedings the government took the position that the suspect image was in plain view on Sell's monitor when the officers initially entered his house (either to make the arrest, or immediately after the arrest, depending on whether one accepts the government's or Sell's version of events). (*See also* Aff. Sp. Agent Sean Brannon ¶17.) Later, Heinrich testified at Sell's suppression hearing only that he saw suspected cannabis and paraphernalia on top of Sell's computer when he initially arrested Sell. (Tr. at 28.)

[3] Computer forensic evidence shows that these images and websites were accessed after Sell was taken to the Streator police department and only the officers were left in the house.

3

has reviewed these photographs: they include pictures of an infant taking a bath, crawling on blankets on the floor, lying on the floor (which picture includes partial views of two adults), and lying on a couch with a stuffed toy. The government has not based its indictment in this case on any of the images viewed on Sell's computer during this initial search or on the baby photos of Sell's daughter.

Later that evening, the officers obtained a search warrant for Sell's computer and seized it. The request for the computer warrant was supported by an affidavit of Illinois State Police Special Agent Sean Brannon which requested the warrant based on the presence in Sell's apartment of several items found during the consent search: (i) the suggestive image allegedly observed on Sell's computer monitor; (ii) one of the baby photos, a picture of Sell's daughter "sitting naked with her legs spread apart;" (iii) assorted CD-ROM discs and other media; (iv) a digital camera and associated devices; and (v) Sell's personal journal containing "sexually explicit language." The government alleges that, during subsequent forensic analysis of Sell's computer, it found approximately eighty-four downloaded images of known victims of child pornography. These are the images on which the government has based its indictment in this case. Sell has moved under the Fourth Amendment to suppress all images obtained from his computer (or viewed by the officers during their initial search), as well as the pictures of his daughter and his personal journal, which was also seized during the initial search.

**Consent to the Initial Search**

Sell argues that his consent to search was limited to a search for narcotics, and that because the officers could not reasonably have expected to find narcotics in his computer files or by viewing his personal photographs or reading his journal, all the evidence, including all evidence found under

the later-obtained warrant to search Sell's computer files, must be suppressed.

A search undertaken pursuant to a defendant's consent must stay within the boundaries of the consent that was given. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The scope of consent is "limited by the breadth of actual consent, and whether the search remained within the boundaries of the consent is a question of fact to be determined from the totality of all the circumstances." *United States v. Raney*, 342 F.3d 551, 556 (7th Cir. 2003) (quoting *United States v. Torres*, 32 F.3d 225, 230-31 (7th Cir. 1994)). In determining the scope of a defendant's consent courts apply an objective standard: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.*

The government first argues that the search that led to discovery of this evidence was within the scope of Sell's consent. In support, the government points out that the consent to search form signed by Sell at 4:25 p.m. indicates his assent to a search of the "[h]ouse located at: 108 W. Broadway, Streator, Illinois," without any written conditions included, and asserts that this indicates that Sell's consent was unconditional. Case law indicates that this argument fails. In *United States v. Lemmons*, 282 F.3d 920 (7th Cir. 2002), the defendant signed a consent form authorizing a general search of his "premises," and the government argued, as it does here, that this evidenced defendant's consent to an unlimited search. *Id.* at 924. The Seventh Circuit ruled that, in light of the officers' prior statements to the defendant that they wanted to search his apartment for certain subject matter (cameras and videotapes of a neighbor's apartment), the totality of the circumstances indicated that the defendant's consent was limited to those areas where such items could reasonably be expected to be found. *Id.* at 924 ("Although the consent form is probative of the voluntariness of [defendant's] consent, it helps little in determining its scope.")

The government also points out that when Sell interrupted Heinrich's call with Towne to consent to the search, Sell did not actually state that the consent was limited to a search for narcotics. As the defendant did in *Lemmons*, Sell responds that the context in which he provided his consent indicates that his consent was limited to a search for narcotics. *See also United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999) ("We ... look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions."). Given the context, Sell argues, any fruits of the warrantless search of his computer (including the later-issued computer warrant and complete search of the computer) must be suppressed. Sell supports this by pointing out that the officers had orally requested his consent to search specifically for narcotics, an assertion that is supported by Clift's testimony at the suppression hearing:

> Q. And that, again, the warrant was to search the house for suspect marijuana or paraphernalia?
> A. That's what we were going to apply for, yes.
> . . .
> Q. At some point, Mr. Sell did consent to the search of his residence, is that right?
> A. Yes.
> Q. And he consented to your search – let me start that one again. He consented to allow you to search for marijuana?
> A. Consented to search [*sic*] of the residence.
> Q. You had told Mr. Sell that you wanted a warrant to search his house for marijuana, is that correct? Sergeant Heinrich did?
> A. We asked for – to start with?
> Q. Yes.
> A. We asked for permission to search his house.
> Q. For marijuana?
> A. I don't think we advised what it was for. We just asked for consent to search his house for narcotics.
> Q. For narcotics?
> A. Yes.

(Tr. at 89-90.)

In addition, while Heinrich was on the telephone with Towne seeking a warrant, Sell was in the same room, just a few feet from Heinrich and was listening to Heinrich's side of the call.

6

Heinrich stated during that call that marijuana and drug paraphernalia had been found in the house, and that the officers were now seeking a search warrant. Heinrich made no reference to child pornography or any other basis for a search warrant. (Tr. at 55-60.) Clift's testimony (he accompanied Heinrich to make the arrest and performed the initial sweep of the house) supports this position: "[h]e [Heinrich] was advising State's Attorney Brian Towne that he was going to try to obtain a search warrant. He told Mr. Towne that there was cannabis in plain view, and Jacob had already told us he would not consent to search." (Tr. at 78-78.) It was in the context of this call that Sell interrupted to give his consent to search. No officer had advised Sell prior to this that his computer (or, for that matter, his journal, photographs, or other media) would be searched.

The only case cited by the government to support its position, *United States v. Torres*, 32 F.3d 225 (7th Cir. 1994), is inapposite. There, during a traffic stop of a sport utility vehicle pulling a horse trailer, police obtained the driver's oral and written consent to search the vehicle and trailer. The written consent signed by defendants in *Torres* indicated that they would allow a search of "any part, compartment, or trunk of the vehicle and the contents of any object or container found therein . . .". *Id.* at 228. The officers found marijuana in a wooden "box-like" compartment in the horse trailer. The Seventh Circuit reversed the district court's grant of a motion to suppress the marijuana because the scope of the consent "could not be clearer" in allowing the officer's search of the box in the trailer. *Id.* at 231. Here, Sell did not provide anything like a *Torres*-style consent to search his computer and personal papers. The totality of the circumstances surrounding Sell's consent to search clearly indicates that he consented to a search for narcotics. The court accordingly finds that Sell's consent was limited to a search for narcotics.

Sell argues that the search of his computer after Hocking informed Heinrich of the suspect

7

image on the screen was not reasonably within the bounds of his consent. Sell supports his position with citations to *United States v. Dichiarinte*, 445 F.2d 126 (7th Cir. 1971) and *Turner*, 169 F.3d 84. In *Dichiarinte*, federal narcotics agents stopped the defendant in his car, and "[i]n response to the question whether he had any narcotics in his home, defendant replied, 'I have never seen narcotics. You guys come over to the house and look, you are welcome to.'" *Dichiarinte*, 445 F.2d at 128. The Seventh Circuit held that Dichiarinte's statement, coupled with the fact that the "evidence at the suppression hearing contains repeated references to the agents' interest in narcotics; and there was no indication that they desired to look for anything other than narcotics themselves," shows that the consent was limited to a search for narcotics. *Id.* at 129. During the search, the agents read the defendant's personal papers and seized documents implicating the defendant in tax fraud. The court found this to exceed the scope of the defendant's consent. Specifically, the officers exceeded the scope of the defendant's consent when they went beyond what was necessary to determine if the defendant had hidden narcotics among his personal papers; "it appears that at least some of the items seized and later used in the Government's tax investigation were not in plain view but had to be opened and read." Similarly, the files on Sell's computer (as well as the pages of Sell's journal and Sell's photographs) had to be opened by the officers to be viewed, and there is no reasonable expectation that narcotics could be hidden in computer files or in the text of Sell's journal. Under the rule of *Dichiarinte*, evidence discovered as a result of the officer's intrusion into Sell's computer files, journal and photographs[4] must be suppressed. *See also United States v. Raney*, 342 F.3d 551,

---

[4] The officers' seizure of the photos of Sell's daughter is also unallowable under the plain view doctrine. The plain-view doctrine allows for seizure of material if: (i) an officer is lawfully present; (ii) an item not named in the warrant (or outside the scope of consent) is in the plain view of the officer; and (iii) the incriminating nature of the item is immediately apparent or the government can show probable cause to believe the item is linked to criminal activity.

556 (7th Cir. 2003) ("We have long recognized that 'government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search.'"), quoting *Dichiarinte*, 445 F.2d at 129.

*Dichiarinte* supports Sell's position, and the other case he relies upon, *United States v. Turner*, 169 F.3d 84 (1st Cir. 1999), does so even more strongly. In *Turner*, the First Circuit affirmed the district court's suppression of images of child pornography found on the defendant's computer. The images were found in the course of a consent search that was limited to allowing the police to search "only in places where an intruder hastily might have disposed of any physical evidence of [an assault on defendant's neighbor] immediately after it occurred." *Id.* at 88 (emphases in original omitted). While a searching officer in *Turner* was "removing boxes from the closet and [was] stacking them on or near the computer station, [the officer] noticed that Turner's computer monitor screen suddenly turned on, and the Windows 'desktop' disclosed a photograph of a nude woman with 'light-colored hair' . . .". The search being conducted was related to an assault on Turner's blond, female neighbor, so the officer continued searching Turner's computer. During this search, the officer found images of suspected child pornography that were used to charge Turner.

The First Circuit held that Turner's consent to search was limited to places where an intruder might have discarded physical evidence of the assault, and that the computer was not such a place.

---

*United States v. Raney*, 342 F.3d 551, 559 (7th Cir. 2003). The government has not shown that the photos of Sell's daughter (or, even more significantly, any specific photo that could be alleged to have an immediately incriminating nature) were in plain view of the officers. Even if it had shown that the photos were in plain view, the government has also not shown that the photos have an incriminating nature that is immediately apparent, or that it had any probable cause to believe that the photos were linked to criminal activity.

9

*Id.* at 88. Significantly for this case, the court also ruled that the fact that the sexually suggestive image came into plain view on the computer screen did not allow a search of the computer:

> [W]e cannot accept the government's contention that the sexually suggestive image which suddenly came into 'plain view' on the computer screen rendered Turner's computer files 'fair game' under a consensual search simply because the Thomas assault had a sexual component (*e.g.*, the attempt to tie her hands). The critical consideration in this regard is that the detectives never announced, *before Turner gave his consent*, that they were investigating a sexual assault or attempted rape.

*Id.* (emphasis in original).

As in *Turner*, Sell was never informed prior to giving his consent that the officers intended to search for anything other than narcotics, and the officers could not reasonably have expected to find narcotics in Sell's computer files. Thus, even were the suspect image seen on Sell's monitor by Hocking and Heinrich in plain view, and the government has not shown, or even argued, that this was the case, the ensuing warrantless search of Sell's computer would have been unallowable.

This highlights another weakness in the government's position. The government does not address how Hocking came to see the suspect image that he brought to Heinrich's attention, and from the facts before the court, it appears more likely than not that the officers actively investigated Sell's computer during their search for narcotics. Upon arresting Sell at approximately 4:15 p.m., neither Heinrich nor Clift (the two officers inside the house at that time) claims to have seen any suggestive pictures on Sell's monitor, despite immediately seeing the suspected cannabis sitting on top of the computer tower right next to the monitor. The officers mentioned only narcotics in their various requests (to Sell and Towne) for a warrant, and thus apparently undertook the consent search of the house without any expectations of finding other contraband. At 4:29 p.m., after the beginning of the consent search, when Heinrich took the photograph of the computer area, the monitor clearly

showed an innocuous screen saver.[5] A screen saver typically remains on the screen until the computer receives input from a user, either from the keyboard or the mouse or other pointing device. Thus, the officers could have seen the suspect image reported by Hocking only if one of them had manipulated the mouse or keyboard to turn the screen saver off, which would have allowed the suspected image to be displayed.[6] Forensic examination of the computer also revealed that images and websites were accessed on Sell's computer between 4:29 and 5:26 p.m., after Sell had already been transported to the Streater police station, indicating that the officers conducted further searches of Sell's computer before the computer warrant was issued later that night. Sell has pointed these issues out in his briefing, and the government has not addressed them.

For the reasons discussed herein, Mr. Sell's supplemental motion to suppress evidence is granted. All evidence found on Sell's computer, including that found pursuant to the warrant issued for the computer on the evening of April 4, 2002, is suppressed, as are Sell's journal and the pictures of his daughter.

Dated: October 31, 2005                    ENTER:

                                           /s/_____
                                           Joan B. Gottschall
                                           United States District Judge

---

[5] As most computer users know, a screen saver is "a computer program that usually displays various images on the screen of a computer that is on but not in use." Merriam-Webster Online Dictionary, at http://www.merriam-webster.com, visited Oct. 16, 2005.

[6] Sell has also contested whether a suggestive image actually would have been displayed when the screen saver was interrupted. Because the court is granting Sell's motion to suppress based on other grounds, it does not discuss this contention.